IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

NANCY HALEY,

        Plaintiff,

     v.

COMMUNITY MERCY HEALTH
PARTNERS D/B/A SPRINGFIELD
REGIONAL MEDICAL CENTER, et al.,

        Defendants.

    :

    :    Case No. 3:11-cv-232

        JUDGE WALTER H. RICE

    :

---

DECISION AND ENTRY OVERRULING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT (DOC. #13); TELEPHONE CONFERENCE SET

---

Plaintiff Nancy Haley filed suit against her former employers, Community Mercy Health Partners, d/b/a Springfield Regional Medical Center and Catholic Healthcare Partners (collectively "SRMC"), alleging violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, and the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2615. Plaintiff also alleges state law civil rights violations under Chapter 4112 of the Ohio Revised Code for age and disability discrimination. The Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over Haley's federal claims and supplemental jurisdiction over her state law claims pursuant to 28 U.S.C. § 1367.

Pending before the Court is the Defendants' Motion for Summary Judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure (Doc. #13). For the reasons set forth below, the Court OVERRULES Defendants' motion.

## I.    Factual Background

The following summary is confined to the undisputed facts. Nancy Haley worked as a registered nurse for SRMC from June of 1978 until April of 2010, a period just short of thirty-two years. Def.'s Answer (Doc. #3) ¶ 20; Def. Ex. #55 (Doc. #18-54). She was 58 years old when SRMC terminated her employment. Doc. #3 ¶ 9. From 1982 onwards, Haley worked as a Staff Nurse in SRMC's operating room. *Id.* ¶ 21. At the time of her termination, Haley performed part of her duties as a member of SRMC's Cardiac Team. Doc. #18-54; Elliot Dep. (Doc. #17) at 21; Abraham Dep. (Doc. #15) at 44. Barbara Elliot was Haley's supervisor from July of 2007 until Haley's termination. Doc. #17 at 21. Elliot was a nurse manager in charge of the operating room and reported directly to Terri Abraham, an SRMC director. Doc. #15 at 9-10.

### A.    Haley's FMLA Leave

During her tenure at SRMC, Haley took FMLA leave due to her own illness and family members' serious health conditions. Between March of 2007 and March of 2008, Haley took two to three days of intermittent FMLA leave every six to eight weeks in order to care for her father, who suffered from a cardiac

2

condition. Pl. Ex. A (Doc. #22-1) at 1-2. After her father's death in July of 2008, Haley took the same type of intermittent leave to care for her mother, who also had heart problems and had recently been diagnosed with breast cancer. Doc. #3 ¶ 27; Doc. #18-55 at 3-4.

Haley herself was diagnosed with breast cancer in November of 2009 and underwent two surgical procedures for treatment. Doc. #18 at 33; Doc. #18-54 at 5-6. She took approximately five and a half weeks of FMLA leave during this time and returned to work on January 18, 2010. Doc. #18 at 33; Doc. #18-54 at 5-6.[1]

### B.    SRMC's Corrective Action Plan

SRMC disciplines employees pursuant to its "Corrective Action" policy, also referred to as "CAP." Doc. #24-1. CAP is a four-stage, progressive process. Doc. #17 at 32-33. The process is "one track," meaning that the violations accrue towards termination regardless of the type of behavior that prompted discipline. *Id.* In other words, SRMC may place an employee at one disciplinary level and then later place the employee at a higher level, even if the incidents involved

---

[1] The parties provide several different dates for this period of leave. Haley states that the FMLA leave occurred from November 20 until November 27, 2009, and from December 8, 2009, until January 29, 2010. Doc. #22 at 7. In its Answer, SRMC states that Haley's FMLA leave lasted from November 23 to November 27, 2009, and from December 3, 2009, to January 17, 2010, with Haley then working half days until February 18. Doc #3 ¶ 7. In their memoranda, the parties do not mention this discrepancy nor do they dispute the general length of the leave involved. The Court does not find the slight difference in these dates to be material to Haley's FMLA claims.

unrelated behavior. *Id*. Referred to as a "Step" or "CAP," each stage moves an employee closer to termination, but also institutes an "action plan" for performance improvement. *Id.* at 32. If an employee's violation warrants discipline, the policy mandates that the supervisor complete a Corrective Action form, "which shall be signed by the associate and placed in the associate's personnel file in the Human Resources Department." Doc. #24-1 at 1.

The first step of discipline, CAP 1, involves an oral warning or "counseling session" that amounts to "more than an anecdotal conversation or a coaching session" and is memorialized in an employee's personnel file. Doc. #17 at 37. CAP 1 may be bypassed if an infraction is deemed "serious enough" by a supervisor, but there is an expectation that a supervisor would first discuss the issue with a department head before skipping a step.[2] Doc. #15 at 28; Doc. #24-1 at 1. CAP 2 involves a written warning, and CAP 3 involves a "final warning" that may or may not involve an employee's three day suspension. Doc. #24-1 at 2. If an employee reaches the fourth step, CAP 4, he or she is terminated. *Id.*; Doc. #17 at 38.

---

[2] In Haley's situation, Step One was bypassed. It is noted that SRMS's policy in fact allows a supervisor to bypass more than the initial step: "However, the circumstances, severity, intent and frequency of the offense could justify initiation of corrective action at Steps Two, Three, or Four." Doc. #24-1 at 2.

### C. CAP 2

In the summer of 2009, SRMC issued a Haley a CAP 2 for missing pages while she was on call. Doc. #18-50. On call employees are expected to carry a pager, provide an alternative form of contact (such as a cell phone), and report to SRMC 20-30 minutes after a page. Doc. #17 at 118, 121. Haley did not initially respond to the hospital's page, was called at home, and arrived at the hospital 37 minutes after the initial page on June 2, 2009. Doc. #18-50. The second page occurred on July 13, 2009, when the page went out at 8:15 p.m. and Haley clocked in at 9:51. *Id*. The Corrective Action Form was signed by Elliot, but Haley did not sign it. *Id* at 2. In the space for the employee's signature, it is instead written "Didn't sign – didn't believe event 6/2 was her fault." *Id*.

### D. CAP 3

SRMC placed Haley at the CAP 3 discipline step on November 9, 2009, for two incidents involving patient "site marking." Doc. #18-52. The hospital's Universal Protocol Policy outlines the procedures by which a patient's "proper surgical or procedure site(s)" are verified before surgery. Doc. #16-3. To safeguard against the occurrence of incorrect surgical procedures, the policy requires that the surgeon mark the site and that he or she do so prior to surgery while the patient is "awake and aware" for verification purposes. *Id.* On October 9, 2009, Haley took an unmarked patient into the operating room. Doc. #18-52. SRMC placed Haley at CAP 3 based on that incident and another that occurred on

5

October 16.  *Id.*  The Corrective Action Form stated that both incidents violated the "established hospital policy regarding site marking for invasive procedures," resulting in Haley being placed on unpaid leave and having to make a brief presentation to operating room staff about the policy.  *Id.*

### E.    CAP 4 & Termination

Haley took "intermittent" FMLA leave approved by SRMC on the following dates in 2010: January 25 and 26, March 4 through March 12, and April 15 and April 16.  Doc. #3 at ¶¶ 34, 36.

On February 12, 2010, Haley's husband, suffering from a heart condition, was transported to SRMC.  Doc. #3 ¶ 35.  Haley accompanied her husband to the hospital and contacted SRMC regarding her inability to work her shift that day.  *Id.* SRMC did not classify any of Haley's time off during her husband's three-day hospitalization as FMLA leave, and marked her absence on February 12, 2010, as "unexcused."  *Id.* ¶¶ 35, 41.

Three days after returning from her April FMLA leave, on Monday, April 19, SRMC terminated Haley.  Doc. #13-1 at 2.  Haley's absence on February 12, 2010, when she was with her hospitalized husband, was listed as one of three unexcused absences on the Corrective Action form filled out for her termination. *Id.*; Doc. #3 ¶ 41; Doc. #15-1 at 1; Doc. #17 at 80.  Those absences, along with eleven instances of tardiness, were listed as the reasons for placing Haley at CAP 4 and terminating her.  Doc. #15-1 at 1.  Elliot had no conversations with Haley

prior to her termination about excessive tardiness or absences.  Doc. #17 at 81-83.

## II.    Procedural Background

On July 1, 2011, Haley filed suit against SMRC, alleging age discrimination claims under the ADEA (Count I) and under Ohio civil rights law (Count II); disability discrimination claims under the ADA (Count III) and under Ohio civil rights law (Count IV); and a claim under the FMLA for retaliation and interference (Count V).  Doc. #1.  In her complaint, Haley alleges that the discipline administered by SRMC and its termination of her employment constituted discrimination based on her age and her disability from breast cancer, as shown by SRMC's differential treatment of a younger, non-disabled coworker with a similar employment record.  *Id.* at 3.  She also alleges that SRMC "disciplined her for conduct that was either manufactured or inflated" after she took FMLA leave to care for her ailing mother.  *Id.* at 2.  Plaintiff further alleges that SRMC's termination of her employment after Plaintiff took FMLA leave for her own breast cancer treatment and her husband's heart condition amounted to retaliation for exercising her statutory right to that leave.  *Id.*  She seeks injunctive relief, compensatory damages, punitive and liquidated damages, attorney's fees and costs.  *Id.* at 10-11.  SRMC filed an Answer to Haley's Complaint on August 30, 2011.  Doc. #3.

SRMC filed a Motion for Summary Judgment on June 25, 2012.  Doc. #13.  In its Motion for Summary Judgment, SRMC argues that Haley fails to present a

7

prima facie case of an age discrimination claim because she presents no direct evidence of discrimination and the only indirect evidence arises from unintentional differential treatment of a younger employee. *Id.* at 11.  SRMC also argues that Haley fails to present a prima facie case of disability discrimination. *Id.* at 12.  The hospital claims that Haley concedes that she is not disabled, and that she therefore fails even to establish the first element of a disability discrimination claim. *Id.* Furthermore, SRMC argues that she cannot succeed on a perceived disability claim because there is no evidence to show that her employers perceived her to be disabled or that they regarded her as being substantially limited by a disability in performing her job. *Id.* at 13.  SRMC contends that the timing of Haley's termination is insufficient to show discrimination, and that Haley's history of discipline at SMRC was a legitimate and nondiscriminatory reason for her termination. *Id.* at 14, 18.  Haley's only evidence of pretext is the temporal proximity of her termination to her last absence, SRMC argues, which the hospital believes is insufficient to rebut its "numerous and legitimate reasons" for discharging her. *Id.* at 18.

Plaintiff Haley responded with her Memorandum in Opposition, filed September 13, 2012.[3] Doc. #22. A Reply in Support of Defendants' Motion for Summary Judgment was filed on October 1, 2012. Doc. #26.

## III. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure sets forth the standard and procedures for summary judgment. Upon motion by either party, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party opposing the motion must "cit[e] to particular parts of materials in the record, including depositions, documents, . . . affidavits or declarations . . . admissions, interrogatory answers," as well as other relevant materials, to demonstrate the existence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1)(A). Generalized assertions lacking the support of particularized citation required by Rule 56 do not suffice, as a court has no "obligation to 'wade through' the record for specific facts" in support of a party's arguments. *United States v. WRW Corp.*, 986 F.2d 138, 143 (6th Cir. 1993) (citing *InterRoyal Corp. v. Sponseller*, 889 F.2d 108 (6th Cir. 1989)).

_____

[3] Although filed eighty days after Defendants' Motion for Summary Judgment, Plaintiff's Memorandum in Opposition was timely filed. On July 5, 2012, she filed an Unopposed Motion for Extension of Time to prepare a response to the Defendants' Motion for Summary Judgment due to incomplete discovery. Doc. #19. The Court sustained this motion, thereby extending the due date for Plaintiff's Memorandum in Opposition until September 13, 2012.

9

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant's burden is to demonstrate "the absence of a genuine issue of material fact as to at least one essential element on each of the Plaintiff's claims." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000) (citing *Celotex*, 477 U.S. at 322).

Once the moving party has demonstrated that no disputed issue of material fact exists, the burden shifts to the nonmoving party to present evidence of a genuine dispute of a material fact that is resolvable only by a jury. *Celotex*, 477 U.S. at 324. At this stage, it is not sufficient for the nonmoving party to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party must "go beyond the pleadings" and present some type of evidentiary material that demonstrates the existence of a genuine dispute. *Celotex*, 477 U.S. at 324. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477

10

U.S. at 322. Conversely, material facts in genuine dispute that "may reasonably be resolved in favor of either party" require denial of summary judgment in order to be properly resolved by a jury. *Anderson*, 477 U.S. at 250.

When ruling on a motion for summary judgment, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id*. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A court must avoid "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts," as such are "jury functions" that are inappropriate to employ at the summary judgment stage. *Anderson*, 477 U.S. at 255.

## IV.    Analysis

Haley's discrimination claims are based on circumstantial and indirect evidence. Her complaint alleges no acts of direct discrimination by her employer, and she concedes in her Memorandum in Opposition that her claims are based only on circumstantial evidence of discrimination. Doc. #22 at 21. Because direct evidence of discrimination is rare, "victims of employment discrimination are permitted to establish their cases through inferential and circumstantial proof." *Kline v. Tenn. Valley Auth.*, 128 F. 3d 337, 348 (6th Cir. 1997). Therefore, Haley's claims under the ADA, ADEA, and the FMLA will be analyzed under the burden shifting method established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Tex. Dept. of Comm. Affairs v. Burdine*,

450 U.S. 248 (1981). *See Geiger v. Tower Auto.*, 579 F.3d 614 (6th Cir. 2009) (applying *McDonnell Douglas-Burdine* framework to age discrimination claims brought under the ADEA);[4] *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008) (applying *McDonnell Douglas-Burdine* to employment disability discrimination claims brought under the ADA); *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007) (applying "tripartite burden-shifting framework" to FMLA retaliation claims based on circumstantial evidence); *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012) (stating that, based on prior Sixth Circuit holdings, *McDonnell Douglas-Burdine* applies to both interference and retaliation claims under the FMLA).

The *McDonnell Douglas-Burdine* burden shifting analysis unfolds in three steps:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the

---

[4] In *Geiger*, the Sixth Circuit interpreted the Supreme Court's decision in *Gross v. FBL Financial Services*, 557 U.S. 167 (2009), as a rejection of the burden shifting analysis of *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), when applied to ADEA claims based on direct evidence of discrimination, not claims based on indirect or circumstantial evidence. *Geiger*, 579 F.3d at 622 (stating "[t]hus, *Gross* overrules our ADEA precedent to the extent that cases applied Title VII's burden-shifting framework if the plaintiff produced direct evidence of age discrimination"). Notably, the Supreme Court "has not definitely decided" the question of whether the *McDonnell Douglas-Burdine* burden shifting analysis applies to ADEA claims based on circumstantial evidence of discrimination. *Gross*, 557 U.S. at 175 n.2; *see also Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 141-42 (2000) (applying *McDonnell Douglas-Burdine* analysis to ADEA claim in light of its widespread application by Courts of Appeals although issue "not squarely addressed" by the Supreme Court). Thus, in the Sixth Circuit, "the *McDonnell Douglas* framework can still be used to analyze ADEA claims based on circumstantial evidence." *Geiger*, 579 F.3d at 622.

> plaintiff succeeds in proving the prima facie case, the burden [of going forward] shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine*, 450 U.S. at 252-53 (citing and quoting *McDonnell Douglas*, 411 U.S. 792, 802, 804 (1973)) (citations omitted). The Sixth Circuit has described the particular application of *McDonnell Douglas-Burdine* in the summary judgment context as follows:

> On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry. The court first determines if a plaintiff has put forth sufficient evidence for a reasonable jury to find her to have met the prima facie requirements, including whether she has met the legitimate expectations of her employer. It performs the same function with respect to defendant's production of evidence, and again for the plaintiff's response to that production.

*Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000).

This framework is also appropriate for the analysis of Haley's state law claims of age and disability discrimination. *See Coryell Bank One Trust Co., N.A.*, 803 N.E.2d 781, 786, 2004-Ohio-723 ¶ 15 (Ohio 2004) (stating that while Ohio courts are "not bound to apply federal court interpretation of federal statutes to analogous Ohio statutes, we have looked to federal case law when considering claims of employment discrimination brought under the Ohio Revised Code").

The Court will first examine the basis for each of Haley's prima facie claims under the ADEA, the ADA, and the FMLA. If Haley is able to make out a prima

13

facie case for any of these claims, the Court will then examine any legitimate, non-discriminatory reasons put forth by SRMC for her discipline and termination. The Court will then examine those reasons in light of the undisputed evidence and determine if a reasonable jury might find them pretextual. If a genuine issue of material fact exists, the Court will be unable to enter summary judgment.

### A.    Age Discrimination Claims

The ADEA prohibits an employer from discharging or discriminating against an individual in the "compensation, terms, conditions, or privileges of employment" because of his or her age. 29. U.S.C. § 623(a)(1). Age discrimination claims brought under the analogous Ohio Civil Rights statute are analyzed according to federal law, so Haley's state law claim will not require a separate analysis. *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 469 (6th Cir. 2002). A successful age discrimination claim requires the plaintiff "to establish that age was the 'but-for cause' of the employer's adverse action." *Gross v. FBLA Fin. Serv.*, 557 U.S. 167, 177 (2009).

> 1.    *Haley satsifies the first three elements of a prima facie case of age discrimination under the ADEA.*

A prima facie showing of age discrimination under the ADEA requires a plaintiff to demonstrate that: "1) she was a member of the protected class, 2) she was subject to an adverse employment action, 3) she was qualified for the position, and 4) she was replaced by someone outside the protected class."

14

*Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2009). The protections of the ADEA apply to persons 40 years of age and older. 29 U.S.C. § 631(a). Haley was 58 at the time of her discharge, and thus satisfies the first element. Doc. #1 ¶ 38; Doc. #3 ¶ 38. Discharge, if done because of an employee's age, is one of the enumerated practices prohibited under the ADEA, and is unquestionably an adverse employment action. 29 U.S.C. § 623(a)(1). Indeed, a discharge for any purpose is an adverse employment action. Haley's discharge is not in dispute, and she thus satisfies the second prong of the prima facie case. Doc. #3 ¶ 37.

Haley also meets the third element of the prima facie case. She was a registered nurse and worked for nearly 32 years in her profession. Doc. #3 ¶¶ 19-20. SRMC's Answer admits that Haley "met the minimum qualifications for her positions but had been a progressively poor performer prior to her termination." Doc. #3 ¶ 49. For purposes of the prima facie inquiry, the only relevant part of SRMC's admission is that Haley was qualified. "[W]hen assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff." *Cline*, 206 F.3d at 660-61. Discharge for good cause is a non-discriminatory basis for termination. 29 U.S.C. § 623(f)(3). Thus, whether or not Haley was a "poor performer" goes to a just cause, nondiscriminatory basis for her

discharge. SRMC's admission that Haley met its standards is therefore adequate for her to show that she was qualified for the position.

2.   *Haley satisfies the fourth element of an ADEA claim by showing that SRMC replaced her with a younger person.*

The fourth element of a prima facie age discrimination claim requires the plaintiff to show that a "substantially younger" person replaced her. *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996). For purposes of the fourth element of a plaintiff's prima facie case based on indirect evidence, "an age difference of six years or less between an employee and a replacement is not significant." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 340 (6th Cir. 2003). Replacement occurs "only when another employee is hired or reassigned to perform the plaintiff's duties." *Id.* at 336 (quoting *Barnes v. GenCorp, Inc.*, 896 F.2d 1465 (6th Cir. 1990)). Barbara Elliot, Haley's supervisor at the time of her termination, stated that Haley's "replacement," Rob Koval, "was a lateral move from another RN already employed in the operating room who was interested in cardiac surgery, and transitioned into her role on the Cardiac Team." Doc. #17 at 53. *Id.* Koval was born in 1965. Doc. #16-4 at 11. In addition, Elianna Dawson, the first person hired after terminating Haley, was born in 1987. *Id.* As Haley was born in 1951, a jury could reasonably believe that SRMC did replace Haley with a significantly younger person.

SRMC argues that because Haley's duties "were spread among the remaining employees" at SRMC, she was not "replaced" in the legal sense required

16

for the fourth element of a prima facie age discrimination claim. SRMC cites *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992), in which the plaintiff's commission-based sales position was eliminated after the employer suffered a "downturn in the market" and the cancellation of several large orders. In *Lilley*, a reduction in force case, the Sixth Circuit stated that "[s]preading the former duties of a terminated employee among the remaining employees does not constitute replacement" that satisfies the fourth element of a plaintiff's prima facie age discrimination claim. *Id.* at 752. This reflects the heightened evidentiary burden a plaintiff bears in a reduction in force case, which requires that she present "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990); *see also Geiger v. Tower Auto.*, 579 F.3d 614, 623 (6th Cir. 2009) (finding that the plaintiff's "discharge and failure to be re-hired arose from a work force reduction" and therefore "must meet a heightened standard to establish a prima facie case"). SRMC does not claim that Haley was terminated based on any reduction in force at its facilities. Furthermore, Elliot's deposition contradicts SRMC's assertion that "duties were absorbed by another member of the cardiac team with her same job classification" because she stated that Koval, Haley's "replacement," had no role on the Cardiac Team prior to Haley's termination. Doc. #26; Doc. #17 at 53.

The facts surrounding Haley's replacement are also clouded by several inaccuracies that Haley points to in SRMC's responses to Plaintiff's Interrogatories.

Doc. #22.  In response to Haley's request for identification of all persons who performed her job duties after termination, SMRC provided a list of 13 different individuals.  Doc. #16-4 at 11.  However, according to Elliot's deposition, at least one of those persons, Jamie Tuttle, did not work in the operating room at all.  Doc. #17 at 55.  SMRC's list stated that another person who performed Haley's duties was Elizabeth Sprinkle, and that Sprinkle started working at SMRC in 2008.  Doc. #16-4 at 11.  However, Elliot stated that Sprinkle did not begin working at SRMC until 2010, and, at the time she started, Sprinkle was a student nurse without licensure.  Doc. #17 at 56-57.  The Court notes another contradiction between SRMC's list and Elliot's testimony.  SRMC identifies Kelly Uzlik's date of hire as May 14, 2008, but Elliot stated that Uzlik had not been hired before Haley's termination in April of 2010, and that Uzlik never worked for Eliot in the operating room.  Doc. #16-4 at 11; Doc. #17 at 56.

Based on the contradictions between Elliot's statements and SRMC's data, the Court concludes that there are genuinely disputed facts regarding Haley's replacement.  Construing them in the light most favorable to Haley, and bearing in mind Elliot's specific identification of Koval as Haley's replacement, the Court cannot rule as a matter of fact or of law that she was not "replaced" by a significantly younger person, as SRMC contends.

3.      *Haley also satisfies the fourth element of her ADEA claim because a reasonable jury might conclude that SRMC gave more favorable treatment to younger employees.*

A plaintiff may also demonstrate the fourth element of a prima facie case of age discrimination by showing that the employer gave more favorable treatment to similarly-situated non-protected employees. *Minadeo v. ICI Paints*, 398 F.3d 751, 764 (6th Cir. 2005) (citing *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002)).  Haley claims that two younger employees, Amanda Dillow and Rick Parker, received more favorable treatment.  Doc #18 at 24.  SRMC admits that Dillow incurred twelve absences and ten tardies in the one year period before Haley's termination, resulting in her placement only at CAP 1, the lowest disciplinary step, which is essentially an oral warning.  Doc. #13 at 13.  Haley, with eleven tardies and four unexcused absences, was placed at CAP 4 and terminated.  Doc. #15-1.

Rick Parker, who was born in 1963, incurred seven tardies by April of 2010, was initially placed on CAP 4 and also faced termination.  Doc. #22-3.  Four of Parker's seven tardies were for clocking in one minute after his shift was to start. *Id.* ¶ 7.  After complaining to both Elliot and Abraham, Parker was placed on CAP 2 and no longer faced termination. *Id.* ¶¶ 11-14; Doc. #22-1 at 6.  Haley also clocked in one minute late four times, but her tardies were not excused and resulted in termination.  Doc. #15-1 at 1, Doc. #e17 at 169.  With attendance violations that equaled or exceeded Haley's violations, SRMC terminated neither employee and placed them at lower disciplinary steps than Haley.  A reasonable

19

jury could determine that SRMC treated Dillow and Parker more favorably than Haley, and there is therefore a genuine issue of material fact as to the fourth element of Haley's prima facie case of age discrimination.

SRMC believes that Haley cannot show more favorable treatment of younger people for two reasons. First, SRMC argues that "corrective action and discipline over attendance were not unique to" Haley because over fifty percent of Elliot's staff also faced "some level of corrective action." Doc. #26 at 4. However, Haley does not argue that she was the only employee who faced discipline. The fact that SRMC disciplined all of its employees, or that half of them faced some type of action based on attendance, does not mean that the hospital did not treat some employees more or less favorably than others. SRMC does not point to an example in the record of another employee it terminated with an attendance record comparable to Haley's or otherwise show that younger employees were not treated more favorably. Haley has pointed to evidence to the contrary, and that is adequate to establish her prima facie case.

SRMC also argues that Dillow was not terminated "due to Elliot's failure to keep track of attendance." Doc. #26 at 4. As with SRMC's contention that Haley's poor performance justified her discharge, this is a nondiscriminatory reason for Haley's termination that is not appropriately considered at the prima facie stage. *See Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000). Based on the foregoing, and bearing in mind that Haley's burden at the prima facie stage "is not onerous," the Court finds that she has established the

20

four elements of her age discrimination claim required to proceed to the second stage of the *McDonnell Douglas-Burdine* analysis. *Tex. Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

### B.  Disability Discrimination Claims

The Americans with Disabilities Act of 1990 ("ADA") prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). As with her age discrimination claims, Haley's state law disability discrimination claim may be evaluated under standards applicable to her federal claim. *See Columbus Civil Serv. Comm'r. v. McGlone*, 697 N.E.2d 204, 206-07 (Ohio 1998) (stating that the Supreme Court of Ohio "can look to regulations and cases interpreting the [ADA] for guidance in our interpretation of Ohio law").

In the Sixth Circuit, a prima facie case of disability discrimination based on indirect evidence requires the plaintiff to show that 1) he or she is disabled; 2) with or without reasonable accommodation, the plaintiff is otherwise qualified for the position; 3) the plaintiff suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the disabled individual was replaced. *Whitfield v. Tenn.*, 639 F.3d 253, 259 (6th Cir. 2011) (citing *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 364-65 (6th Cir. 2007)). The threshold question, whether or not Haley was "disabled" under the

21

ADA, is the only prima facie element of her claim that SRMC challenges.  Doc. #13 at 11-15.

The ADA defines disability in three ways: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ."  42 U.S.C. § 12102(1).  An impairment includes "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine . . . ."  29 C.F.R. § 1630.2(h)(1).  Ohio law tracks these examples of impairment, but specifically includes cancer as well.  Ohio Rev. Code § 4112.01(16)(a)(iii).  Haley's cancer was a physiological condition affecting multiple body systems and was treated by a mastectomy, resulting in an anatomical loss.  It unquestionably qualifies as an impairment under the ADA.  *See Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 190 (5th Cir. 1996) (analyzing ADA disability claim based on impairment of plaintiff's breast cancer).

However, the recognition of a plaintiff's impairment is only a threshold issue in determining whether or not she has a disability under the ADA.  When Congress passed the ADA Amendment Acts of 2008 ("ADAAA"), it amended the statute with specific rules of construction for defining a disability.  ADA Amendments Act of 2008, Pub. L. 110-315; 42 U.S.C. § 12102(4).  These rules of construction

22

state that definitions of disability are to be drawn "in favor of broad coverage of individuals . . . to the maximum extent permitted" by the statute.  42 U.S.C.  § 12102(4)(A).  Therefore, when analyzing whether an impairment "substantially limits" an individual's major life activity, courts should interpret that phrase in accordance with the findings and purposes of the ADAAA.  *Id.* § 12102(4)(B).  In passing the ADAAA, Congress intended to "state a broad scope of protection to be available under the ADA" and specifically reject the "inappropriately high" standards for interpreting the term "substantially limits" articulated by the Supreme Court in *Sutton v. United Air Lines*, 527 U.S. 471 (1999) and *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002).  Pub. L. 110-315.

The ADAAA also provides that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."  42 U.S.C. § 12102(4)(D).  Major life activities include working.  *Id.* § 12102(2)(A).  A major life activity may also include "the operation of a major bodily function" such as "normal cell growth . . . ."  *Id*. § 12102(2)(B).  Thus, the Equal Employment Opportunity Commission, applying the principles of construction described above, states that "it should be easily concluded" that cancer, as an impairment, substantially limits the major life activity of normal cell growth.  29 C.F.R. §1630.2(j)(3)(iii).

Mindful of Congress's mandate to construe the ADA broadly when defining a disability and the non-onerous burden on the plaintiff at the initial stage of the *McDonnell-Douglas-Burdine* analysis, the Court finds that a reasonable jury could

23

conclude that Haley was disabled under the ADA, and therefore fulfills the first element of her prima facie claim. She was obviously disabled when the cancer was active, as it substantially limited the major life activity of normal cell growth. In addition, the cancer substantially limited the major life activity of her work. Haley took extensive time off for surgery and recuperation between the end of November 2009 and January 18, 2010, during which time she could not work at all. Doc. #18 at 33; Doc. #18-54 at 5-6. When Haley did return to work, her activity was substantially limited by initially being restricted to half days. Doc #3 ¶ 7. If her cancer were to recur and become active again, it would again substantially limit the two areas of major life activity of work and normal cell growth. Other courts have reached the same conclusion when a plaintiff's prima facie case states that cancer, although in remission, is the basis for defining her disability under the ADA. *See Katz v. Adecco USA, Inc.*, 845 F.Supp.2d 539, 548 (S.D.N.Y 2012) (stating that as "a result of the amendments to the ADA, it appears not to matter that [the plaintiff's] cancer was in remission at the time of the alleged discrimination"); *Norton v. Assisted Living Concepts, Inc.*, 786 F.Supp. 2d 1173 (E.D. Tex. 2011) (holding that renal cancer could be classified as disability under the ADA); *Hoffman v. Carefirst of Fort Wayne, Inc.*, 737 F.Supp. 2d 976, 985 (N.D. Ind. 2010) (holding that cancer in remission constitutes disability based upon the "clear language" of 42 U.S.C. § 12102(4)(D)); *see also Angell v. Fairmount Fire Prot. Dist.*, No. 11–cv–03025–CMA–CBS, 2012 WL

24

5389777 (D.Colo. Nov. 5, 2012); *Unangst v. Dual Temp Co., Inc.*, No. 10-6811, 2012 WL 931130 (E.D. Pa. Mar. 19, 2012).

SRMC presents several reasons why it believes Haley cannot meet the first element of a prima facie disability discrimination claim.  First, SRMC claims that Haley has no direct evidence of disability, pointing to Haley's response of "no" during her deposition when asked "do you consider yourself disabled?" and "are you disabled?"  Doc. #13 at 12.  SRMC misunderstands the basis of Haley's claim, which is indirect or circumstantial evidence.  A lack of direct evidence is therefore not fatal to Haley's claim.  Furthermore, Haley's statements are not particularly probative of the determination of whether she is disabled under the ADA, which is a legal definition quite distinct from the colloquial meaning of "disabled."  This Court has reached the conclusion that a reasonable jury could conclude that Haley was disabled, *as defined under the ADA*, only after consulting the technical specifications of the statute, regulations, and relevant case law.  None of those authorities require a plaintiff to affirmatively self-identify as "disabled" in order to meet the legal definition of having a disability under the ADA.

Second, SRMC argues that Haley cannot "succeed on a theory of perceived disability" -- presumably a reference to the option of a plaintiff to show that she was "regarded as" having an impairment under 42 U.S.C. § 12102(1)(C).  Doc. #13 at 15.  Because the Court finds that a reasonable jury could conclude that she was disabled under 42 U.S.C. § 12102(1)(A), Haley need not also show that she

25

was "regarded as having [] an impairment" under Subsection C of the statute. The requirements of 42 U.S.C. § 12102(1) are disjunctive.

Even if Haley had brought a "regarded as" disabled claim, SRMC's argument would be unconvincing because of its basis on overruled authority. Doc. #13 at 15. SRMC asserts that to make out a claim based on a perception of disability, the third prong of 42 U.S.C. § 12102(1), Haley "must show [that] SRMC regarded her as being substantially limited in performing either a class of jobs or a broad range of jobs in various classes," citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999). *Id.* When enacting the ADAAA, Congress expressly stated that one of its purposes was "to reject the Supreme Court's reasoning in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) with regard to coverage *under the third prong of definition of disability*" and to restore previous reasoning in line with the "definition of handicap under the Rehabilitation Act of 1973." Pub. L. 110-315 § 2(b)(3) (emphasis added). We also have the benefit of the Sixth Circuit's explanation in *Milholland v. Sumner County Board of Education*, 569 F.3d 562, 566 (6th Cir. 2009), that "[t]he amended version of the ADA no longer requires the plaintiff bringing a claim under subpart (C) to show that the impairment limited her life activity, including working in a broad class of jobs." SRMC's reliance on case law from outside the Sixth Circuit predating the ADAAA amendments and applying case law overruled by those amendments is equally unpersuasive. Doc. #13 at 14-15 (citing *Giordano v. New York*, 274 F.3d 740 (2nd Cir. 2001) (applying *Sutton*) and *Treiber v. Lindeberg Sch. Dist.*, 199 F.Supp. 2d 949, 959-60

26

(E.D. Mo. 2002) (applying *Toyota*)). "In citing authorities, the Court prefers that counsel rely upon cases decided by the Supreme Court of the United States, the United States Court of Appeals for the Sixth Circuit (or, in appropriate cases, the Federal Circuit), the Supreme Court of Ohio, and this Court." S.D. Ohio Civ. R. 7.2(b)(2).

Other than the "disabled" element, SRMC does not challenge any other element of Haley's prima facie case of disability discrimination. Doc. #13 at 12-14. The Court interprets these omissions as SRMC's concession, for purposes of its motion, that Haley can show the other elements of her prima facie case of such discrimination. Because the Court has determined that a jury could reasonably conclude that Haley was disabled under the ADA, SRMC is not entitled to summary judgment on her ADA or state law claims for disability discrimination for failure to make a prima facie case. Her claims therefore survive the first stage of the *McDonnell Douglas-Burdine* analysis.

### C.    Claims for Interference and Retaliation under the FMLA

The Family and Medical Leave Act ("FMLA") was enacted to help employees balance their families' needs with "the demands of the workplace" and to allow them "to take reasonable leave for medical reasons . . . and for the care of a child, spouse, or parent who has a serious health condition." 29 U.S.C. § 2601(b). During any twelve-month period, the FMLA provides an employee with the right to twelve weeks of leave "[b]ecause of a serious health condition that makes the

27

employee unable to perform the functions" of his or her job. *Id*. § 2612(a)(1)(D). The employee may also take leave, counted towards the same twelve week period, in order to care for a spouse or parent with a serious health condition. *Id*. § 2612(a)(1)(C).

The Sixth Circuit has recognized "two distinct theories of recovery under the FMLA." *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004). The first is the "interference" or "entitlement" theory. It is based on 29 U.S.C. § 2615(a)(1), which states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." The second theory of recovery involves FMLA "retaliation" or "discrimination" claims. These arise under 29 U.S.C. § 2615(a)(2), which prohibits employers from discharging or otherwise discriminating against individuals who oppose unlawful FMLA practices. In this case, Plaintiff has asserted both an interference claim and a retaliation claim under the FMLA.

        *1.     Haley states a claim for interference under the FMLA.*

A plaintiff's prima facie interference claim requires her to show that "(1) she was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled." *Edgar v. JAC Prod, Inc.*, 443 F.3d 501, 507 (6th Cir. 2006).

28

SRMC's arguments attack the fourth and fifth elements of Haley's prima facie case.[5] The fourth element is the crucial one, however, because, if Haley gave proper notice of her intention to take leave on February 12, 2010, then SRMS's categorization of that time off as "unexcused" supports a claim that she was denied the benefit of that leave. Thus, an initial assessment must be made of the requirements for "notice" under the FMLA and whether a reasonable jury could find that Haley's actions amounted to sufficient notice.

The FMLA only addresses notice in cases of "foreseeable leave," such as the leave required for an expected child or planned medical treatment. 29 U.S.C. § 2612(e). The FMLA's implementing regulations, however, do address notice requirements for unforeseeable leave. 29 C.F.R. § 825.303. With regard to timing, "an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case." *Id.* § 825.303 (a). The regulation also provides the following hypothetical, particularly applicable here:

> For example, if an employee's child has a severe asthma attack and the employee takes the child to the emergency room, the employee would not be required to leave his or her child in order to report the absence while the child is receiving emergency treatment.

*Id.*

---

[5] Haley's complaint presents her FMLA retaliation and interference claims as stemming from several acts by SMRC, without specifying which particular act or acts form the basis for her interference claim. Doc. #1 ¶ 78. As SRMC points out, the categorization of her February 12, 2010, absence as unexcused instead of excused FMLA leave is the only cognizable basis for an interference claim. Doc. #13 at 18. Haley's Memorandum in Response to SRMC's Motion for Summary Judgment concedes as much, as she only addresses the February 12, 2010, absence and SRMC's treatment of it in the context of her interference claim.

Here, a reasonable jury could certainly conclude that Haley's notice was timely. She was able to report her absence while her husband was receiving medical treatment because of the unusual fact that he was transported to her employer, SRMC, for treatment. While there is some confusion as to whom exactly she reported at the time,[6] it is undisputed that Haley contacted SRMC. Doc. #3 ¶35. Haley's supervisor, Barb Elliot, knew on that day that Haley was in the emergency room with her husband. Doc. #17 at 76, 81. Haley states that she gave this notice by 6:30 a.m. that day. Doc. #22-2 at 2.

The content of the notice must also contain "sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." 29 C.F.R. § 825.303(b). "The critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Walton v. Ford Motor Co.*, 424 F.3d 481, 486 (6th Cir. 2005) (quoting *Brohm v. JH Props., Inc.*, 149 F.3d 517, 523 (6th Cir. 1998)). Furthermore, "[t]he employer will be expected to obtain any additional required information through informal means." 29 C.F.R. § 825.303 (b). Here, Haley called her department early that morning, informed SRMC that she was in the emergency room with her husband, and stated

---

[6] According to Haley's deposition, Rose White was the "desk person" on duty that morning, but Haley phoned before White arrived and asked that her message be relayed. Doc. #18 at 53-54. White did not recall Haley's husband's hospitalization (Doc. #25 at 11), but did confirm that either she or Elliot would have been the person contacted in the event of an employee's absence due to an emergency (Doc. #25 at 12).

that "I won't be in to work until I find out what's going on with him." Doc. #18 at
54. Haley was nevertheless able to work the next two days of the three that her
husband spent in the hospital. Doc. #17 a79. Barb Elliot stated that she had been
relayed the message that Haley was in SRMC's emergency room with her husband.
*Id*. at 81. Elliot also knew Haley's husband "had chest pain," which she agreed
was a "serious medical condition." *Id*. at 76. Elliot also did not make any attempt
to contact Haley that day. *Id.* A jury could reasonably conclude that Haley gave
sufficient and timely notice that FMLA leave might apply to her absence on
February 12, 2010, because SRMC knew of it the day it occurred and it concerned
her husband's serious medical condition. For purposes of summary judgment,
therefore, Haley can fulfill the fourth element of a prima facie interference claim.

SRMC argues that Haley cannot establish the fifth element of an FMLA
interference claim because her complaint "plainly aver[red]" that "she was granted
all the FMLA leave she requested," precluding any allegation that she was denied a
benefit provided by the statute. Doc. #13 at 18. This argument misunderstands
the nature of Haley's FMLA claim, which is based on SRMC's classification of her
leave as unauthorized and her resulting termination. This is evident from Paragraph
74 through paragraph 80 of Haley's complaint, wherein she alleges that SRMC
"fail[ed] to categorize her leave as FMLA" after absences due to serious health
conditions of herself, her mother, and her husband. Doc. #1.

More importantly, for purposes of summary judgment, SRMC admits to the
following facts: Haley's husband was transported to SRMC for his heart condition

31

on February 12, 2010; Haley contacted SRMC regarding her absence; during the three days of her husband's hospitalization, Haley had no FMLA leave; and SRMC marked her absence on February 12, 2010, as "unexcused." Doc. #3 ¶¶35, 41. Based on those undisputed facts, a jury could reasonably conclude that SRMC denied Haley FMLA leave by categorizing her February 12, 2010, absence as unexcused, and that she, therefore, has stated a prima facie claim for FMLA interference.

> 2.     *Haley states a claim for retaliation under the FMLA.*

For Haley to make out a prima facie retaliation/termination claim under the FMLA, she must show that 1) she availed herself of a right protected under the FMLA, 2) she suffered an adverse employment action, and 3) a causal connection exists between the adverse action and the exercise of her FMLA-protected right. *See Edgar v. JAC Products, Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). The first two elements of the claim are satisfied. As detailed *supra* in Section I.A., Haley availed herself of FMLA leave multiple times in the year before her termination and she was subject to the adverse employment action of termination.

A reasonable jury might also conclude that a causal connection existed between that FMLA leave and her termination, which would satisy the third element of her prima facie case of FMLA retaliation or termination. The Sixth Circuit has held that "[p]roximity in time between the protected activity and the adverse employment action may constitute evidence of a causal connection."

32

*Bryson v. Regis*, 498 F.3d 561, 571 (6th Cir. 2007) (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001)). In *Bryson*, the Sixth Circuit found that the plaintiff's termination on the day she returned from three months of FMLA leave coupled with statements that her employer was angry about the leave and that it intended to terminate her sufficed to make out a prima facie case for retaliation. *Bryson*, 498 F.3d at 571. Likewise, in *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012), the plaintiff satisfied "the low threshold of proof necessary to establish a prima facie case of retaliatory discharge" where the facts showed he was terminated within three weeks of returning from FMLA leave and two months after first notifying the employer of the need for leave.

Here, it is undisputed that Haley took "intermittent" FMLA leave on the following dates in 2010: January 25 and 26, March 4 through March 12, and on April 15 and 16. Doc. #3 at ¶¶ 34, 36. Three days later, on Monday, April 19, SRMC terminated Haley. Doc. #13-1 at 2. The temporal proximity of her termination to the leave taken, particularly against the background of the extensive leave taken in November and December of 2009 and January of 2010, meet the threshold required to state a prima facie case of retaliation. In addition, Elliot believed that Haley had lied to her in the past about her use of FMLA leave. Doc. #17 at 123-24. This comports with the level of proof considered adequate for stating a prima facie case in *Bryson*. *Bryson*, 498 F.3d at 571.

33

SRMC believes that Haley cannot make out a prima facie case of retaliation under the FMLA. It argues that Haley cannot "draw a nexus between her termination and her alleged use of FMLA time," because her February 12, 2010, absence was unexcused, not FMLA time. Doc. #13 at 19. However, this is tautological because, as stated above, Haley has made out a prima facie case that SRMC's categorization of that time as unexcused interfered with a statutory right. A reasonable jury could also infer a causal connection between SRMC's decision to mark a day that Haley was entitled to FMLA leave as unexcused and its termination of Haley, because it relied in part on that unexcused absence when terminating her.

SRMC also challenges the inclusion of events "outside the FMLA's 2 year statute of limitations for interference claims" on a timeline of events in Haley's Memorandum in Opposition. Doc. #26 at 8. SRMC believes that Haley's mention of the FMLA leave she took in 2007 is an attempt to apply a "continuing violations" theory under the FMLA that is unsupported by Sixth Circuit authority. *Id.* The Court believes that this argument is illogical, as Haley alleges no violation in 2007. The statute provides that "an action may be brought under this section *not later than 2 years after the date of the last event constituting the alleged violation* for which the action is brought." 29 U.S.C. § 2617(c) (emphasis added). Her timeline mentions no adverse action taken by SRMC in 2007, only the FMLA leave that Haley took. Her termination in April of 2010 was the "first material adverse action" taken by SRMC that justified filing suit. *Butler v. Owens-*

34

*Brickaway Plastics Prod., Inc.*, 199 F.3d 314, 317 (6th Cir. 1999). Likewise, the statute of limitations would not be implicated by any FMLA violations a jury might recognize based on the temporal proximity of SRMC's progressive discipline of Haley to her FMLA leave during 2009. This is because only SRMC's termination of Haley's employment was:

> the first action serious enough to warrant plaintiff's resort to the legal system. To hold otherwise would force plaintiffs to bring suit each time they are assessed a negative mark on their absentee record, but before this mark results in probation, termination, failure to reinstate, or other adverse action. As [the plaintiff notes], such a requirement would unnecessarily clog the federal courts with premature claims.

*Id.*

Based on the foregoing, the Court finds that Haley has presented evidence sufficient for a reasonable jury to conclude that she has stated prima facie cases for both interference and retaliation under the FMLA.

### D. SRMC's Legitimate, Nondiscriminatory Reasons for Haley's Termination and Discipline

Haley's statement of a prima facie case of age discrimination under the ADEA shifts the burden of production to SRMC "to articulate some legitimate, nondiscriminatory reason" for her discharge. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Excessive tardiness and absenteeism are nondiscriminatory reasons for termination. *See Weigel v. Baptist Hosp. of East Tennessee*, 302 F.3d 367, 378-79 (6th Cir. 2002) (finding nurse's "systematic absenteeism" a legitimate, nondiscriminatory reason for discharge); *Townley v.*

*Blue Cross & Blue Shield*, 254 F.Supp. 2d 661, 669-70 (E.D. Mich. 2003) (citing *Weigel* and finding "excessive absenteeism and tardiness" legitimate and nondiscriminatory reasons for termination of claims processor).

Here, SRMC states that Haley was terminated "for a chronic pattern of tardy arrival to work and multiple unexcused absences" that violated its established attendance policy. Doc. #13 at 3; Doc. #13-2 at 4. The hospital's policy states that "[a]ppropriate corrective action up to and including discharge may result when an associate's attendance record is determined to exceed acceptable standards." Doc. #13-1 at 15. The reasons are simple: in a hospital, employees with tardiness and unexcused absences "create a hardship for other associates and impact the delivery of patient/resident care." *Id.* at 14. SRMC's interest in enforcing its attendance policies is underscored by its responsibility to its patients, who have literally placed their lives in the hospital's hands. Violation of SRMC's attendance policy is an unquestionably legitimate and nondiscriminatory basis for just cause termination.

Haley's discharge form lists eleven dates that she was tardy between November 5, 2009, and April 6, 2010, as well as four unexcused absences. Doc. #13-1 at 2. The form indicates that the "Type of Action" taken is "Discharge" and provides as a "Reason for Action" the following:

> During the past six months, Nancy has demonstrated a chronic pattern of tardy arrival and multiple unexcused absences. This is a violation of HR policy 12.00 Attendance. Nancy received information regarding professional accountability and the need to be personally responsible for knowing the policies of the organization and what

36

must be done to adhere to those policies during department meetings held December 17, 2009 & March 18, 2010.

*Id.* The Court finds that SRMC has satisfied its burden of production. By pointing to Haley's violation of its attendance policy though multiple absences and instances of tardiness, SRMC has articulated an unquestionably legitimate and nondiscriminatory reason for terminating her employment.

In addition, SRMC placed Haley at the second and third stages of its progressive disciplinary policy prior to termination. SRMC's stated reasons for taking those adverse employment actions against Haley, that she failed to respond to pages while "on call" and that she failed to follow the hospital's policy for patient surgical site marking, are both legitimate and nondiscriminatory. SRMC paged Haley while she was on call, because physicians required the assistance of Cardiac Team nurses to operate on patients with suddenly deteriorating conditions. Doc. #15-3. Disciplining a nurse for late response or no response in such a life threatening situation is unquestionably legitimate. Furthermore, the hospital's "Universal Protocol Policy" on site marking puts in place careful procedures and safeguards to ensure that the proper surgical site is marked on a patient before any invasive procedure is performed. *See* Doc. #16-3. Violation of a policy in place to prevent drastic medical error is an indisputably legitimate and nondiscriminatory reason for discipline.

**E.    A Reasonable Jury Could Find that SMRC's Reasons for Disciplining and Terminating Haley were Pretextual**

After an employer articulates a legitimate, nondiscriminatory reason for its actions, the burden shifts back to the plaintiff, who must prove by a preponderance of the evidence that the employer's reasons are pretextual. *Burdine*, 450 U.S. at 253. To survive summary judgment, the plaintiff must "produce[] evidence from which a jury could reasonably doubt the employer's explanation. If so, her prima facie case is sufficient to support an inference of discrimination at trial." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)). Conversely, "summary judgment is proper if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation." *Chen*, 580 F.3d at 400 n.4 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)). The plaintiff may prove pretext by showing that the reasons offered by the defendant 1) had no basis in fact; 2) were not the actual reasons for the defendant's actions; or 3) were an insufficient basis for the defendant's actions. *Manzer v. Diamond Shamrock Chems.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (*overruled on other grounds by Geiger v. Tower Auto.*, 579 F.3d 614 (6th Cir. 2009)). Haley believes that a reasonable jury would find that SRMC's articulated reasons for her discipline and termination were pretextual under each of *Manzer*'s three inquiries.

1.     *A reasonable jury might question the factual bases of the site marking incidents and Haley's attendance violations.*

A showing that the defendants' reasons had no basis in fact is "easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, *i.e.*, that they are 'factually false.'"  *Manzer*, 29 F.3d at 1084 (quoting *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1124 (7th Cir. 1994)).   Haley challenges the factual bases supporting each disciplinary step SRMC placed her on before termination and believes that a jury could "reject" each of them.  Doc. #22 at 32-34.

There is sufficient dispute surrounding the two patient site marking incidents from which a jury might conclude that no factual basis supported placing Haley on the CAP 3 discipline step.  The corrective action form describes two incidents: a violation for transporting a patient to the operating room before the patient had been site marked and another for "attempt[ing] to mark the site herself" before other staff paged the surgeon to mark the site.  Doc. #18-52 at 1.  Haley disputed that she ever marked or attempted to mark a patient's surgical site herself.  Doc. #22-2 at 1; Doc. #18-55 at 3-4.  In the grievance filed with her termination, Haley stated that she offered to take the patient to the operating room for the physician to site mark the patient there in order to expedite the case, because the physician had been upset about a thirty minute delay in the procedure.  Doc. #18-55 at 3-4.

Further complicating the picture is SRMC's statement, in its Responses to Plaintiff's Interrogatories, that Haley was terminated *"when she mismarked a*

*patient for surgery* and failed to respond twice when she was on call as a surgical nurse." Doc. #16-4 at 5 (emphasis added). SRMC, by stating that Haley "mismarked" a patient, avers that Haley both marked a patient's surgical site herself and that she marked the site *incorrectly*. Yet Elliott, Haley's supervisor, stated in her deposition that Haley neither marked nor mismarked a patient. Doc. #17 at 128. SRMC's statement not only contradicts Elliot's deposition, it alleges a more serious violation: the actual mismarking of the procedure site on a patient before surgery. Elliot also stated that Haley would not have been put on the CAP 3 disciplinary step for just one incident of offering to site mark a patient. *Id.* at 131. Construing the foregoing in Haley's favor, genuine issues of material fact exist as to whether this disciplinary step had a "basis in fact." A reasonable jury could find that in at least one incident, Haley did not mark, mismark, or offer to mark a patient, and consequently, that there was no basis in fact for placing her on the CAP 3 disciplinary step.

Haley also claims that a jury could question "the factual basis of SRMC's claim that [she] was chronically tardy." Doc. #22 at 33. She points out that the determination of an employee's tardiness could only be made by a comparison of the employee's schedule with data from the electronic time clock, and SRMC's failure to preserve these schedules entitles her to a rebuttable presumption that they would benefit her case. *Id*. The Court finds it unnecessary to reach this issue of spoliation at this time, however, because the printout from the time clock alone presents conflicting evidence that, if admissible, would best be evaluated by a jury.

40

On that printout, there are handwritten notations ("due at 6:00") next to many entries that correspond to the tardies listed on Haley's termination form. Doc. #13-1 at 4-16. However, many entries also state that they are "approved by supervisor." *Id.* Whether or not the handwritten notations appear derived from the schedule is an inference that is a "jury function," as is the weight to be given to the printout itself and any resolution of its contradictory indications. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If the tardies were "approved by [a] supervisor," as the printout indicates, a reasonable jury could infer that the SRMC's categorization of them as unexcused was pretextual.

Haley claims that the CAP 2, the first progressive disciplinary step of consequence that Haley was subjected to, was never officially administered and that Elliot "was putting disciplinary documents in Haley's file without telling Haley." Doc. #22 at 32. Haley is not arguing that she did, in fact, respond to the pages in a timely fashion while on call, nor does she allege that SRMC fabricated its charges. She makes no challenge to SRMC's timeline of the pages and her delayed arrival. According to the Corrective Action Form filled out by Elliot, SRMC policy expects an employee to respond to a page within five minutes and arrive at the hospital within 20-30 minutes. Doc. #15-3. Based on the timeline on the form, Haley did not respond to the hospital's page, was called at home, and arrived at the hospital 37 minutes after the initial page on June 2, 2009. The second incident occurred on July 13, 2009, when the page went out at 8:15 p.m. and Haley clocked in at 9:51. She was indisputably late according to hospital policy on

41

each occasion. Thus, while a jury could reasonably conclude there was no basis in fact for the site marking incidents and Haley's attendance violations, a factual basis did exist for placing Haley at the CAP 2 discipline step for not answering pages while on call.

> 2. *A reasonable jury could conclude that SRMC's proffered reasons did not actually motivate Haley's discipline or termination.*

Haley's challenge to the CAP 2 discipline step is more properly evaluated under the second *Manzer* inquiry, which requires the plaintiff to show that the proffered reasons did not actually motivate the employer's actions. *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Under this inquiry, "[t]he plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one." *Id.*

Although Haley's untimely arrival after being paged was a basis for discipline, Haley disputes that SRMC ever formally placed her at CAP 2 and claims that she was never formally disciplined at the time. Doc. #18-55 at 2. After discussing the incidents, Haley's termination grievance states that Elliot gave her no indication that Haley was going to be formally disciplined and did not ask her to sign anything. *Id*. Supporting this contention is Haley's handwritten indication on the CAP 3 form (issued several months after the CAP 2) that she was not aware

42

that the paging incidents had resulted in her being placed on the second disciplinary step. Doc. #18-52 at 2. Elliot, however, indicated on the CAP 3 form that Haley had seen the CAP 2 form but refused to sign it. *Id.* Haley also points out that the CAP 2 form does not bear a "Received" stamp from SRMC's human resources department, as do the other disciplinary forms that Elliott drafted. *Compare id. with* Doc. #15-3. Because of this, Haley claims that the disciplinary step itself never occurred in an official manner and that Elliot "was putting disciplinary documents in Haley's file without telling Haley." Doc. #22 at 32. Construing the foregoing in Haley's favor, a reasonable jury might conclude that the CAP 2 step was bypassed in order to hasten Haley's termination. The Court concludes that a jury should decide these contested factual issues, which are material because the issuance of the CAP 2 was a necessary predicate to Haley's termination.

3.      *A reasonable jury could conclude that SRMC's proffered reasons were insufficient to discharge Haley.*

Under the third possible showing of pretext, the plaintiff must present sufficient "evidence that other employees, particularly employees outside the protected class, were not disciplined even though they engaged in substantially identical conduct to that which the employer contends motivated its discipline of the plaintiff." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012) (citing *Manzer*, 29 F.3d at 1084). This type of pretext also constitutes "a direct attack on the credibility of the employer's proffered motivation for

disciplining the plaintiff," resulting in the factfinder's possible– but not required–inference of discrimination. *Chattman*, 686 F.3d at 349; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (stating that "rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination). In a summary judgment context, such an inference "creates a genuine, triable issue of material fact." *Chattman*, 686 F.3d at 349.

Haley argues that a jury could conclude that her attendance was an insufficient reason for her discharge, pointing to SRMC's dissimilar treatment of two similarly situated, younger employees. Both Amanda Dillow and Rick Parker were younger, had similar or worse attendance records, yet SRMC neither terminated nor similarly disciplined either employee. *See supra* Section IV.A. A reasonable jury could infer discrimination from SRMC's different treatment of its younger employees.

SRMC responds that this discrepancy in treatment was due to Elliot's "inability to keep up with her workload" because, as supervisor, she had over 100 employees who reported to her. Doc. #13 at 13. The explanation may very well convince a jury, but that would involve a determination of credibility that only a jury should make. A reasonable jury might believe that SRMC's treatment was due solely to Elliot's inability to adequately monitor all the employees who reported to her; or, in the alternative, it might find Elliot's explanation pretextual. Because of this, a genuine issue of material fact exists as to whether discrimination or Eliot's overwork lay behind SRMC's differential treatment of Haley.

"Pretext is a commonsense inquiry: did the employer fire employee for the stated reason or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4. The Court cannot answer this question at the summary judgment stage, because of the array of unresolved factual issues that a reasonable jury could consider pretextual. To summarize, these include the factual bases for the site marking incidents (further confused by SRMC's inconsistent evidence and statements) and Haley's attendance record; whether Haley was actually placed on the CAP 2 disciplinary step; and the more lenient stance SRMC took with similarly situated employees.

The Court finds that Haley has presented sufficient evidence of genuinely disputed material facts such that a jury could doubt SRMC's stated reasons for its actions. As the Sixth Circuit stated in *Chen*, "[a]t the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation. If so, her prima facie case is sufficient to support an inference of discrimination at trial." *Chen*, 580 F.3d at 400 n.4 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). The Court accordingly makes no determination as to the discrimination Haley alleges that a jury might or might not infer from SRMC's actions. Such a determination is solely the function of the jury, as is the resolution of the disputed factual issues described herein.

## V.   Conclusion

Accordingly, for the reasons set forth above, the Court OVERRULES Defendants' Motion for Summary Judgment (Doc. #13).

Counsel of record will note that a telephone conference call will be convened by the Court at 8:30 a.m. on Friday, February 8, 2013, for the purpose of determining the viability of the May 20, 2013 trial date.

Date: January 28, 2013                            _Walter H. Rice_____
                                                  WALTER H. RICE
                                                  UNITED STATES DISTRICT JUDGE